# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| ANDREA VALDEZ,<br><br>      Plaintiff,<br><br>vs.<br><br>HEXCEL CORPORATION,<br><br>      Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br>Case No. 2:11-cv-422 |

      Plaintiff Andrea Valdez asserts numerous claims against Defendant Hexcel Corporation for extensive injuries that Ms. Valdez sustained when her arm was caught between two large motorized rollers at a Hexcel facility in Salt Lake City. Hexcel moves the court to enter summary judgment in its favor on all of Ms. Valdez's causes of action. Hexcel contends that Utah's worker compensation system bars all claims for a worker's injuries unless those injuries were caused by the intentional conduct of the employee. Hexcel further argues that there is no genuine issue of material fact about whether Ms. Valdez's injuries were the result of intentional conduct. For the reasons stated below, the court agrees with Hexcel and GRANTS its Motion for Summary Judgment (Dkt. No. 25).

## BACKGROUND

      Hexcel manufactures carbon fiber and other composite materials at a Salt Lake City facility where Ms. Valdez was employed. One collection of machinery, known as Tower 1, contains a number of motorized rollers that are used to wind fiberglass cloth onto spools after the

cloth has been coated with resin. Ms. Valdez was injured by one set of these motorized rollers called the drive rolls. The drive rolls consist of two large rollers, each about five and a half feet wide, that are stacked on top of each other. When operating, the two rolls turn in opposite directions such that a person standing on the west, or out-running, side of the rolls would observe the rolls turning away from each other. If someone were to place her hand between the rolls on the west side, the rotation would cause her hand to come back out. Conversely, the rolls turn towards each other from the perspective of someone standing on the east, or inboard, side. If someone were to place her hand between the rolls on the east side, the rotation would pull the person's hand between the rolls. On the south side of the drive rolls, a control panel contains a jog button that is used to control the rotation of the rolls.

On May 4, 2007, Ms. Valdez and one of her fellow crewmembers, Kristine Christensen, were assigned to clean the drive rolls by Allen Carter, their crew supervisor. According to Ms. Christensen, she and Ms. Valdez had not performed this task before. (Christensen Dep. 34:6-9.) Ms. Valdez and Ms. Christensen stood on the out-running side of the rolls and wiped them down in rags soaked with acetone. Mr. Carter jammed a knife blade between the jog button and its housing in such a way that the jog button remained engaged and the rolls kept turning. Ms. Christensen testified that Mr. Carter was using the knife trick to cut corners and save time. (*Id.* at 36:24-25.) After Ms. Valdez and Ms. Christensen finished cleaning the drive rolls, Mr. Carter inspected them and noticed that resin dust had fallen on them from a nearby set of rollers that a fourth crewmember, Ricky Romero, had been vacuuming. Ms. Valdez testified that the dust fell on the east side of the rolls, which was the inboard side. (Valdez Dep. 132:2-4.) Mr. Carter told Ms. Valdez to clean the drive rolls again. He then walked to the end of Tower 1, about thirty feet

away from the drive rolls, to complete paperwork needed for the next production run.

What happened next differs in the deposition testimony of Ms. Valdez and Ms. Christensen. According to Ms. Christensen, the drive rolls never stopped running throughout the following events. (*Id.* at 54:6-15.) But according to Ms. Valdez, the drive rolls were not turning when Mr. Carter inspected them. Rather than returning to the out-running side of the rolls to clean off the resin dust, Ms. Valdez approached the drive rolls from the inboard side where the dust had fallen. She testified that the drive rolls were still not moving at this time. Then, as Ms. Valdez was cleaning the rolls with her right hand and resting her left hand on the lower drive roll, the rolls started to turn. Ms. Valdez's left hand was immediately caught between them. The rolls continued to rotate, pulling Ms. Valdez's left arm between them up to her shoulder.

Ms. Christensen ran to find an emergency override, or E-stop, but testified that she was unable to locate one because the nearest switch was hidden by boxes. (*Id.* at 45:19-23.) The rolls continued to turn until Mr. Romero pulled the knife out of the jog button. Mr. Carter testified that he was unaware of how the knife got back into the switch. (Carter Dep. 57:6-9.) Mr. Carter agreed with Ms. Valdez that the drive rolls were not moving when he asked her to clean them again. (*Id.* at 56:4-8.) But Ms. Christensen maintains that Mr. Carter asked her to lie about the incident. According to Ms. Christensen, Mr. Carter suggested that Ms. Christensen should say that the rollers kept turning because she had her thumb on the jog button and not because of the knife: "Allen came out to me and says, 'Hey, Kris, let's just tell them that you had your thumb on the job button and you didn't realize that Andrea was being pulled in until it was too late." (Christensen Dep. 62:25-63:4.) Ms. Christensen refused to adopt this version of events and stated that she later asked to be placed under a different supervisor because Mr. Allen

"was really making things hard" for her. (*Id.* at 63:25.)

If Mr. Carter is correct that the drive rolls had stopped turning, then someone must have put the knife back into the switch to hold down the jog button just before Ms. Valdez was injured. Ms. Valdez testified that she looked over at the control panel when she felt her fingers being pulled between the drive rolls, but she did not see anyone standing there. (Valdez Dep. 149:5-17.) She also stated that her whole crew "got along fine" and that she had no reason to believe that anyone on her crew wanted to hurt her that day. (*Id.* at 158:4-11.) According to Lynn Muir, who is the Director of Operations at Hexcel, Hexcel later conducted an investigation of the incident, but no one ever confessed to putting the knife in the switch or accused anyone else of that action. (Muir Dep. 87:3-14.)

In contrast to Ms. Valdez and Mr. Carter's testimony, Steven Broadhead, Hexcel's Production Supervisor, expressed doubt that the rolls had stopped moving. He stated that, while it was a possibility that the rolls were stopped and then turned on, he was surprised that Ms. Valdez had been trapped all the way up to her shoulder if the rolls were really stopped, since the rolls start turning at a very slow rate. (Broadhead Dep. 29:17-22.) He also testified that, when a machine starts, there are five or six alarm buzzers over a period of about ten seconds to alert people that the equipment is turning on. (*Id.* at 52:3-10.) Mr. Broadhead later sent an email about the incident to Brett Dick, Hexcel's Engineering Manager. Mr. Broadhead stated: "I am still pretty shaken by what I witnessed yesterday. Never want to see that again." (Brett Dick Email, Ex. 1 to Pl.'s Opp. Mem., Dkt. No. 29-1.) Mr. Dick responded that he "figured that someone would eventually do this . . . . With all of the new people coming in, somebody was going to screw up." (*Id.*)

4

As a result of her injury, Ms. Valdez alleges that she had fourteen surgeries, became addicted to painkillers, and faced extensive medical bills. Ms. Valdez received workers' compensation benefits, but she contends that these benefits only partially covered her injuries and that she never received a final payment. (Pl.'s Opp. Mem. 9, Dkt. No. 29.)

STANDARD OF REVIEW

The court grants summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." N. Natural Gas Co. v. Nash Oil & Gas, Inc., 526 F.3d 626, 629 (10th Cir. 2008).

ANALYSIS

Ms. Valdez alleges twelve causes of action against Hexcel. Because many of her claims are preempted by the Utah Workers' Compensation Act, the court will first address Ms. Valdez's claims for intentional injury, which the Utah Supreme Court has held may constitute an exception to the general bar against employee lawsuits for workplace injuries.

**I. Intentional Injury and Intentional Infliction of Emotional Distress**

The Utah Workers' Compensation Act relieves employers of any common law liability for injuries sustained by an employee "on account of any accident or injury or death" that is "contracted, sustained, aggravated, or incurred by the employee in the course of or because of or arising out of the employee's employment." Utah Code Ann. § 34A-2-105(1). "In place of common law remedies, the [Workers' Compensation] Act creates an administrative scheme that seeks to provide a simple, adequate, and speedy remedy for workers injured on the job, while

also protecting employers from disruptive or vexatious lawsuits for alleged negligence." *Helf v. Chevron*, 203 P.3d 962, 967 (Utah 2009) (citations omitted). Indeed, the "primary objective of workers' compensation has been to remove industrial negligence, in all its forms, from the concept of the law of tort." *Id.* (citations omitted).

In 1975, the Utah Supreme Court recognized that the rule barring employee lawsuits against employers for negligence does not extend to intentional injuries. *See Bryan v. Utah Int'l*, 533 P.2d 892 (Utah 1975). The Court clarified the scope of this exception in 2009 in the case of *Helf v. Chevron*:

> We therefore hold that the "intent to injure" standard requires a specific mental state in which the actor knew or expected that injury would be the consequence of his action. To demonstrate intent, a plaintiff may show that the actor desired the consequences of his actions, or that the actor believed the consequences were virtually certain to result. But a plaintiff may not demonstrate intent by showing merely that some injury was substantially certain to occur at some time. For a workplace injury to qualify as an intentional injury under the Act, the employer or supervisor must know or expect that the assigned task will injure the particular employee that undertakes it. In other words, the employer must know or expect that a specific employee will be injured doing a specific task. In these situations, the knowledge and expectation that injury will occur robs an injury of its accidental character, moving it out of the realm of negligence and into the realm of intent.

*Helf*, 203 P.3d at 974. In *Helf*, an employee of the Chevron refinery was instructed to perform a neutralization process despite a supervisor's knowledge that, earlier in the day, the same process had resulted in the release of a toxic purple cloud. *Id.* at 966. The Utah Supreme Court held that Ms. Helf had stated a claim for intentional injury because "her supervisors knew or expected that re-initiating the neutralization process would result in her injury." *Id.* at 974.

Here, Ms. Valdez has also stated a claim for intentional injury. But the question at the summary judgment stage is whether Ms. Valdez has brought forward admissible facts to support

6

her assertion that Hexcel intended to injure her. The court finds that she has not. While there remain disputed facts about the details of the accident, including the question of whether the drive rolls were running when Ms. Valdez went over to the inboard side of the rolls to clean them, these factual disputes do not present any questions of material fact. If the drive rolls were not rotating, Ms. Valdez has not provided any evidence to show that someone turned them back on to injure her while she was standing next to them. Instead, Ms. Valdez testified that everyone on her work crew got along and that she had no reason to believe that anyone wanted to hurt her. And if the drive rolls were running continuously, Ms. Valdez has not brought forward any evidence to suggest that Mr. Carter ordered her to clean the rolls from the inboard side, thereby putting her in such obvious danger that a jury might find that his order was intended to injure her. While Ms. Valdez may have understood Mr. Carter's order to mean that she should clean the rolls from the side where the dust had fallen, the evidence provided to the court does not support an inference that Mr. Carter intended for his order to be interpreted in this way.

Ms. Valdez argues that the accident would not have occurred if Hexcel had put additional safety measures into place or provided more training to its employees. But while these allegations could support the assertion that Hexcel was negligent in its conduct, they provide no evidence that Hexcel intended to injure Ms. Valdez. Ms. Valdez also provides an email from Brett Dick, Hexcel's Engineering Manager, who wrote to Mr. Broadhead: "I figured that someone would eventually do this." (Ex. 1 to Pl.'s Opp. Mem., Dkt. No. 29.) Ms. Valdez contends that this email demonstrates that Hexcel was virtually certain that her accident would occur. The court is not persuaded by her argument because the Utah Supreme Court was explicit when it ruled that a plaintiff may not demonstrate intent "by showing merely that some injury

was substantially certain to occur at some time." *Helf*, 203 P.3d at 974. Mr. Dick's email, even if the court reads it to imply that Mr. Dick believed that some future injury was almost certain to occur at Hexcel, says nothing about an intent by an individual actor or by Hexcel at large to injure Ms. Valdez specifically.

The court also notes that, even though the Utah Supreme Court allowed Ms. Helf to proceed with an intentional injury claim by reversing the trial court's original decision granting the Defendant's Motion to Dismiss, Ms. Helf was later unable to survive the summary judgment stage because the trial court held that she had failed to provide evidence of intent. (*See* Def.'s Reply Mem., Ex. I.) While the trial court's ruling in Ms. Helf's case is not dispositive,[1] the court finds that the allegations in Ms. Helf's case are far more suggestive of an intent to injure than the facts here. Ms. Helf was ordered to perform a dangerous procedure despite her supervisor's knowledge of the extremely adverse effects of the neutralization process. The initial attempt to neutralize the toxic sludge had released a purple cloud that drifted across the Chevron refinery, "setting off alarms and causing several Chevron employees, some of whom were hundreds of yards from the open-air pit, to fall ill and be sent home." *Helf*, 203 P.3d at 966. Despite knowledge of these events, Ms. Helf's supervisor still told her to start the process later that day.

Here, there is no evidence that Ms. Valdez's supervisor required her to place herself within the path of danger. While there is no question that Ms. Valdez's injury was tragic and horrific, the law that the court must apply to this case instructs the court not to consider the seriousness of Ms. Valdez's injury or even the magnitude of the errors committed by Hexcel that

---

[1]In any event, Ms. Helf has appealed the summary judgment decision to the Utah Supreme Court and the case remains pending.

caused Ms. Valdez to be hurt.  As the Utah Supreme Court stated, "what is being tested here is not the degree of gravity or depravity of the employer's conduct, but rather the narrow issue of the intentional versus the accidental quality of the precise event producing injury." *Id.* at 970 (quoting 6 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* (2000)).  The evidence that Ms. Valdez presents to the court demonstrates that she was involved in a terrible accident that was likely the result of errors and perhaps even gross negligence on the part of Hexcel, but it is insufficient to support an inference that her injuries were the result of Hexcel's intentional acts.

Even if Ms. Valdez's injury was the result of gross negligence, the Utah Supreme Court ruled that Utah does not follow the twelve states who have adopted a broader definition of "intentional acts" in order to subject some employers to liability for gross negligence.  *Helf*, 203 P.3d at 969.  Unless the Court reverses itself on this decision or adopts a more expansive definition of intent, Ms. Valdez's claim is barred by the exclusive remedy provision of the Utah workmen's compensation statute.

Because Ms. Valdez has not brought forward any admissible evidence to show that Hexcel intended to cause her injury, the court dismisses her causes of action for intentional injury and intentional infliction of emotional distress.

**II.  Negligence and Negligent Infliction of Emotional Distress**

Ms. Valdez does not dispute that her claims for negligence and for negligent infliction of emotional distress are barred by the exclusive remedy provision of the Workers' Compensation Act.  *See* Utah Code Ann. § 34A-2-105(1); *see also Retherford v. AT&T Commc'ns*, 844 P.2d 949, 965 (Utah 1992) (barring negligence claims for injuries covered under the Workers'

9

Compensation Act); *Sauers v. Salt Lake County*, 735 F. Supp. 381, 385 (D. Utah 1990) (barring claims for negligent infliction of emotional distress for covered workplace injuries). Accordingly, the court dismisses these causes of action.

**III. Conspiracy and Fraudulent Concealment, Breach of Quasi-Contract, and Breach of the Implied Covenant of Good Faith and Fair Dealing**

Ms. Valdez asserts that three of her causes of action (for conspiracy and fraudulent concealment, breach of quasi-contract, and breach of the implied covenant of good faith and fair dealing) arise out the employment contract that she had with Hexcel, in which Hexcel made representations that it would provide its employees with a safe work environment. But the essence of Ms. Valdez's claims still derive from the personal injury she suffered. The Utah Supreme Court has held that, regardless of how a plaintiff labels her causes of action, the Workers' Compensation Act bars all suits arising out of workplace injuries except in cases of intentional injury: "The exclusivity provision of the [Workers' Compensation Act] focuses not upon the nature of the claim, but upon the nature of the injury for which compensation is sought." *Cook v. Zions First Nat'l Bank*, 57 P.3d 1084, 1087 (Utah 2002).

Ms. Valdez's claims for conspiracy, breach of quasi-contract, and breach of the implied covenant of good faith and fair dealing all stem from the personal injury she suffered at the workplace and not from any other aspect of her employment. These claims are therefore barred by the exclusivity provision of the Utah Workers' Compensation Act and the court dismisses them.

**IV. Violation of Public Policy, Due Process, Equal Protection, Irreparable Injury, and Private Attorney General**

Ms. Valdez argues that Hexcel violated Utah public policy through its disregard for Ms. Valdez's safety. The court must dismiss this claim because, like the contract claims discussed above, the public policy allegation still derives from an injury that is clearly covered by the Utah Workers' Compensation Act. As a result, Ms. Valdez's claim is barred by the exclusivity provision of that Act.

To the extent that Ms. Valdez's real public policy argument is that Hexcel has failed to comply with the statutory obligations of the Workers' Compensation Act regarding the payment of compensation benefits, the court has no jurisdiction to hear these contentions. Ms. Valdez has provided no evidence that she pursued such a claim before the Utah Labor Commission after filing her initial application for hearing. She also has provided no evidence that she appealed an administrative law judge's decision or sought review of a decision of the Appeals Board or a commissioner. These actions are all prerequisites that Ms. Valdez must perform before she can seek judicial review of an administrative adjudication. *See* Utah Code Ann. § 34A-2-801(2), (3) (administrative law judge's decision is final unless an employee files timely motion for review); Utah Code Ann. § 34A-2-801(7), (8) (decision of commissioner or Appeals Board on appeal is final unless an employee seeks timely judicial review and exhausts her remedies before the Utah Labor Commission). Because Ms. Valdez did not exhaust her administrative remedies before filing this claim, the court cannot consider any allegations that Hexcel was deficient in its payment of workers' compensation benefits. *See Frito-Lay v. Utah Labor Comm'n*, 222 P.3d 55, 63 (a reviewing court lacks jurisdiction to review a case in which the plaintiff has not exhausted

11

her administrative remedies).

Ms. Valdez also alleges that the Utah Workers' Compensation Act caused her irreparable injury and violated her rights to equal protection and due process of the law under the Fourteenth Amendment of the United States Constitution. These claims fail because workers' compensation statutes have been clearly upheld by both the United States Supreme Court and the Utah Supreme Court. *See New York C.R. Co. v. White*, 243 U.S. 188 (1917) (holding that workers' compensation laws do not violate the Fourteenth Amendment); *Cudahy Packing Co. v. Indus. Comm'n*, 60 Utah 161, 171 (Utah 1922) ("That the general and underlying principles of the Workmen's Compensation Law do not conflict with any constitutional right of employer or employee is not an open question in this state."). As a result, the court dismisses Ms. Valdez's due process and equal protection claims, as well as her irreparable injury claim for injunctive relief against the enforcement of the Utah Workers' Compensation Act.

Finally, Ms. Valdez claims to appear as a private attorney general for the State of Utah to enforce against Hexcel any violations of Utah's Occupational Safety and Health Act. But the authority to administer this Act is vested exclusively in the Utah Labor Commission and its Division of Occupational Safety and Health. Utah Code Ann. § 34A-6-104(1). Nothing in the Act authorizes an employee to act as a private attorney general to enforce the rules and regulations of the Utah Labor Commission. Accordingly, the court dismisses Ms. Valdez's claim and her request for attorney's fees.

CONCLUSION

For the reasons stated above, the court dismisses all of Ms. Valdez's claims against Hexcel. As a result, Hexcel's Motion for Summary Judgment (Dkt. No. 25) is GRANTED and

the court orders the Clerk of the Court to close the case.

    SO ORDERED this 30th day of July, 2013.

                                BY THE COURT:

                                _____
                                ROBERT J. SHELBY
                                United States District Judge